## ALPHONSO C. WIGGINS *v.* STATE OF MARYLAND ET AL.

[No. 29, September Term, 1974.]

*Decided August 7, 1974.*

The cause was argued before Orth, C. J., and Gilbert and Lowe, JJ.

*Peter S. Smith* with whom was *Michael S. Elder* on the brief, for appellant.

*David B. Allen, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Donald R. Stutman, Assistant Attorney General* and *David H. Feldman, Assistant Attorney General,* on the brief, for appellees.

Lowe, J., delivered the opinion of the Court.

When the General Assembly provided the Circuit Courts with exclusive juvenile jurisdiction in 1945 another attempt was made to establish age 18 as the uniform age in Maryland for such jurisdiction.[1] The goal of uniformity was again aborted. Baltimore City and three counties were permitted to remain exempt. The counties subsequently conformed. Baltimore City, on the other hand, chose to retain the provision of its local law first enacted in 1902,[2]

---

\* Note: *Certiorari* granted, Court of Appeals of Maryland, October 24, 1974.

1. Laws of Md. 1945, Ch. 797. In 1941, an amendment to Md. Code, Art. 52, § 83 (1939 ed.) changed from 16 to 18 the age of juveniles subject to the exclusive jurisdiction of special justices of the peace, known as Magistrates for Juvenile Causes, in every subdivision except Baltimore City, Allegany County, Washington County and Baltimore County. Laws of Md. 1941, Ch. 807. The 1945 Amendment, which transferred jurisdiction in juvenile causes from these magistrates to the "Circuit Court for _____ County, sitting as a Juvenile Court," was not applicable in Baltimore City, or Washington, Allegany, or Montgomery Counties. Laws of Md. 1945, Ch. 797, §§ 48A, 48U.

2. Laws of Md. 1902, Ch. 611. In 1943, an amendment to Article 4, Code of Public Local Laws of Maryland and the Baltimore City Charter (1938 ed.) abolished the offices of Magistrate and Assistant Magistrate for Juvenile Causes and conferred jurisdiction in juvenile causes upon the Circuit Court

which established 16 as the maximum age for juvenile jurisdiction in Baltimore City.

On August 6, 1970 the United States District Court for the District of Maryland found Baltimore City's unique treatment of youths 16 through 18 as adults arbitrary and unreasonable and declared it an unconstitutional denial of equal protection and due process under the Fourteenth Amendment to the Constitution of the United States. *Long v. Robinson*, 316 F. Supp. 22, 30. The United States Court of Appeals for the Fourth Circuit affirmed that decision including the " . . . limitation of [its] application . . . only to those whose convictions had not become final as of the date of the institution of this action on May 15, 1969." *Long v. Robinson*, 436 F. 2d 1116, 1120. The Court declined to decide the question of retroactivity because it found that no member of the class before the court represented the interests of those persons whose convictions had become final as of May 15, 1969.

On January 29, 1971 this court accepted the reasoning of the District Court's opinion in *Long* concerning the unconstitutionality of the law in question, Md. Code, Art. 26, § 70-1 (c). *Greene v. State*, 11 Md. App. 106, 110-111. We decided, however, to meet the question of retroactivity in an effort to minimize the administrative dislocation which usually follows constitutional storms. *Greene v. State*, *supra*, 111. We held that the decision was not to be fully retroactive and accepted the May 15, 1969 cut-off date applied in both *Long* decisions. The following year, the Court

---

of Baltimore City in causes involving persons under the age of 16. Laws of Md. 1943, Ch. 818, subsequently codified as §§ 238 through 257, Article 4 of the Baltimore City Charter and Code of Public Local Laws (1949 ed.). Appellant was tried pursuant to §§ 240 and 241 defining a "child" as one under 16 and granting the Circuit Court exclusive jurisdiction over such children who performed certain specified acts. Sections 239 to 257, inclusive, were repealed by a 1966 amendment scheduled to take effect June 1, 1966, at which time it was intended that Md. Code, Art. 26, §§ 51, *et seq.* would govern juvenile causes in Baltimore City. Laws of Md. 1966, Ch. 127. Subsequent revisions of the provisions of Article 26 relating to Juvenile Causes delayed the effective date of the 18 year old maximum age in Baltimore City first until July 1, 1970, Laws of Md. 1969, Ch. 432, and later until July 1, 1971, Laws of Md. 1970, Ch. 730. The substance of the provisions regarding juvenile matters now appears in the Courts and Judicial Proceedings Article (Courts Art.) §§ 3-801, *et seq.*

of Appeals of Maryland expressly approved that determination of retroactivity and the selection of the date of finality. *Franklin v. State,* 264 Md. 62, 68.

Less than eight months later the United States Court of Appeals for the Fourth Circuit, faced directly with the question of the application of its decision in *Long* to persons whose convictions had become final prior to May 15, 1969, held that *Long* should be retroactively applied and that the propriety of the remedy of expunction should be determined on a case by case basis. *Woodall v. Pettibone,* 465 F. 2d 49, 52.

Notwithstanding that favorable federal precedent, the appellant, Alphonso C. Wiggins, chose as his forum for similar declaratory and injunctive relief the Circuit Court of Baltimore City. He sued the State of Maryland and the Clerk of the Criminal Court of Baltimore seeking the expunction of six convictions of burglary, obtained prior to his 18th birthday,[3] the sentences for which had all been served.[4]

The Attorney General filed a Motion Raising Preliminary Objection on behalf of the State asserting immunity from suit. The motion was granted. His demurrer on behalf of the Clerk of Court was granted without leave to amend by Judge James Murphy, who relied on *Franklin v. State, supra,* and *Greene v. State, supra.*

Appellant raises three issues:

> 1) the contemporary propriety of sovereign immunity,

---

[3]. Appellant was first convicted and sentenced for an offense committed after his 16th birthday. While so imprisoned he was charged with two offenses committed three weeks prior to his 16th birthday and three committed thereafter. The juvenile court signed an order waiving jurisdiction as to the two offenses committed prior to age 16. The State has stipulated that no waiver hearing was held prior to the signing of the waiver order.

[4]. Counsel for appellant did not inform us in his brief or in oral argument whether or not appellant's probation has yet expired. Should it have, as is likely, we question his assumption that Woodall is dispositive of the issue of Long's retroactivity in cases in which the applicant for federal habeas corpus relief is no longer subject to the control or supervision of penal authorities. *See* Woodall v. Pettibone, *supra,* 53, and our discussion *infra.*

2) the granting of the demurrer, and (anticipating success)

3) the appropriate remedy (expungement).

Blended, they seek our retroactive application of the holding in *Greene* which followed *Long*. As a consequence, we shall treat the questions collectively and by so doing respond directly to the essential issue of retroactivity which underlies the technical questions raised by appellant.

## Sovereign Immunity

Appellant argues that we should refuse to recognize the State's immunity from suit since " . . . neither the purpose of this doctrine nor justice is served by applying it to the instant circumstances." He does not deny that the doctrine of sovereign immunity exists in Maryland but, because he sees it as outmoded, and because it is " . . . presently under attack from many sides," *Littell v. Morton*, 445 F. 2d 1207, 1214, he maintains that we should give " . . . careful consideration . . . to the appropriateness of its application in particular cases."

We are not at liberty to pick and choose when to apply legal doctrines, nor should we be. If the doctrine of sovereign immunity is to be changed or abolished it is a matter for the Legislature and not for the courts. Cf., *Chas. E. Brohawn & Bros. v. Bd. of Trustees of Chesapeake College*, 269 Md. 164, 166. The Motion Raising Preliminary Objection was properly granted.

## Demurrer

Feinting then with a procedural jab, preliminary to the major encounter, appellant cites *Shapiro v. Bd. of County Commissioners*, 219 Md. 298, 302, for the premise that " . . . a demurrer is rarely appropriate in a declaratory judgment action." We note, however, that the reason the Court of Appeals takes a dim view of that procedural deterrent in such a case is that it wishes to avoid dismissal without a declaration of rights of the parties.

In ruling upon a demurrer a court should, of course, consider only whether plaintiff is entitled to a declaration,

not whether he is right or wrong. A demurrer is, therefore, restricted to challenging the legal availability of the remedy sought. *Hunt v. Montgomery County,* 248 Md. 403, 408-410.

The ruling of the court below clearly showed that the appellant, whose convictions became final prior to May 15, 1969, was not entitled to a declaration because of the prior decisions of this Court and of the Court of Appeals obviating the declaratory relief he prayed. In short, his rights had been determined and previously declared in *Greene* and *Franklin.* A second declaration, which was the remedy he sought, was not available to him and a demurrer was a proper procedure to challenge its availability.

## Retroactivity

The more basic question of whether appellant is entitled to benefit retroactively from the holding of *Long* would appear to be the one of overriding importance. Appellant was apparently inspired by the holding of the Federal Courts in *Woodall,* but nonetheless chose a state forum adversely committed against his case to seek relief. He appears more interested in posing to us and to the Court of Appeals the academic question of whether we will change our respective holdings in *Greene* and *Franklin* regarding retroactivity than in seeking the relief he would have us believe the Federal Courts would make available to him. For the reasons hereafter expressed, we are not so inclined.

Appellant argues that, because the issue of retroactivity was not directly presented, briefed or argued before us in *Greene,* or before the Court of Appeals in *Franklin,* the rulings in those cases with respect to retroactivity were dicta which we should not weigh heavily in reaching our conclusion in this case. Whether or not appellant feels this Court and the Court of Appeals meant what we said in *Greene* and *Franklin,* Judge Craven, writing for the United States Court of Appeals in *Woodall* was obviously convinced:

"That the question of retroactivity was not briefed and argued before the Maryland Court of Special Appeals and the Maryland Court of Appeals, the highest court of the state, does not convince us that

the Maryland courts did not mean what they said. Whether or not they were specifically asked to decide the question of retroactivity, they have done so." *Woodall v. Pettibone, supra,* 51.

Because the question of retroactivity is now before us, fully briefed and argued, we have reviewed the question in an effort to avoid whatever uncertainty may have arisen in the wake of *Woodall.*

Ten months after the United States Court of Appeals decided *Woodall,* the Supreme Court in *Gosa v. Mayden,* 413 U. S. 665, had occasion to view the question of retroactivity against a factual background analogous to the one before us here. With the advantage of this renewed direction in our quest to balance the interests of society against essential justice to the individual, we are even more persuaded of the restricted application of *Long* adopted in *Greene.*

Speaking for a plurality of the Court in *Gosa,* Mr. Justice Blackmun ruled that the Court's decision in *O'Callahan v. Parker,* 395 U. S. 258 (holding that a serviceman charged with a non-service connected crime is entitled to indictment by a grand jury and trial by a jury in a civilian court), should not be given retroactive application. In making that determination, Mr. Justice Blackmun applied the test utilized in *Linkletter v. Walker,* 381 U. S. 618, and rearticulated in *Stovall v. Denno,* 388 U. S. 293:

" . . . '(a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards.' " *Gosa v. Mayden, supra,* 679, quoting *Stovall v. Denno, supra,* 297.

The plurality opinion found the three prong test pertinent in *Gosa* where the Court was principally concerned "with the appropriateness of the exercise of jurisdiction by a military forum," and not with either "procedural rights or trial methods," as it had been in *Linkletter* and its progeny, or with "a constitutional right [double jeopardy] that operates

to prevent another trial from taking place at all," as it had been in *Robinson v. Neil*, 409 U. S. 505. *Gosa v. Mayden*, *supra*, 679. Likening the issue of subject matter jurisdiction to that of entitlement to trial by jury, the opinion emphasized that the *Linkletter/Stovall* test had been utilized in *DeStephano v. Woods*, 392 U. S. 631, a per curiam opinion denying retroactivity to *Duncan v. Louisiana*, 391 U. S. 145, and *Bloom v. Illinois*, 391 U. S. 194, "in each of which a right to a jury trial had been enunciated." *Gosa v. Mayden*, *supra*, 679. We have applied this test fully recognizing that the plurality opinion in *Gosa* is not binding upon us. *Baker, Whitfield and Wilson v. State*, 15 Md. App. 73, 82. *Gosa* provides no panacea; it does, however, give us valuable guidance.

### (a) The Purpose

The purpose of the constitutional doctrine espoused in *Long* was to make equally available to all juveniles in Maryland, not yet 18, who had committed delinquent acts, the benefit of a program of treatment, training and rehabilitation consistent with the protection of the public interest in place of the taint of criminality and the consequences of criminal behavior.[5] The denial of such treatment to persons 16 to 18 in one locality does not impair the truth finding function of the adult criminal court in which appellant was tried, nor does it raise serious question as to the accuracy of the verdict adjudging him guilty as charged. See *Williams v. United States*, 401 U. S. 646, 653. The appellant did not contend below, or on appeal, that he was deprived of any of the essentials of a fair trial in the Criminal Court of Baltimore. While, appellant was denied

---

5. *See* Long v. Robinson, *supra*, 28. *See also* the declaration of purposes of the Maryland "Juvenile Causes" Act, Md. Code, Art. 26, § 70 (2), now found in Courts Art. § 3-802 (a) (2) and (3). The express purpose of the waiver hearing, made applicable by Long, was to determine whether juveniles between 16 and 18 years of age would have been receptive to a rehabilitation program, *i.e.*, the juvenile defendant's " . . . amenability to treatment in any institution, facility, or program available to delinquents." Md. Code, Art. 70-16 (b) (3), now found in Courts Art. § 3-816 (c) (3). The fact that appellant was not given a waiver hearing does not in any way impugn the adult process by which he was convicted.

"... the only opportunity an accused has to plead the defense of his diminished responsibility as a juvenile," *Kemplen v. State of Maryland,* 428 F. 2d 169, 177, we do not equate this lost advantage with a denial of the "fundamental integrity" of the actual trial process. It had no bearing on the determination of appellant's guilt. But see *Woodall v. Pettibone, supra,* 52.

As Mr. Justice Blackmun observed, the purpose to be served by *O'Callahan*'s new standard was to grant military personnel the right to be tried for non-service related crimes in the less rigid civilian fora.[6] The possible unfairness of the harsher military system of justice was not ignored· in the majority opinion in *O'Callahan,* in which Mr. Justice Douglas stressed possible military command influence and the lack of certain procedural safeguards. *O'Callahan v. Parker, supra,* 263-266. Nevertheless the Supreme Court in *Gosa,* did not find the military forum so basically unfair as to warrant the retrospective application of the *O'Callahan* holding.

Appellant here decries the harshness of subjecting a young person to an adult criminal court and denying him the empathy of a juvenile forum. We find that the harshness of the adult criminal procedure in Maryland in no way equals that of the military courts which the Supreme Court in *Gosa* decided did not warrant retroactivity. Beyond that, as onerous as appellant's record of six felony convictions in the Criminal Court may be, it is the severity of that record rather than the integrity of the process from which it was derived which causes appellant to suffer.

The purpose behind the rule of *Long* and *Greene* does not mandate retroactivity.

### (b) Reliance

The authorities cannot be faulted for relying on the statutory law of Maryland and of Baltimore City as it stood

---

6. The right to a civilian forum for non-service connected crimes was afforded military personnel who would otherwise be denied "two important constitutional guarantees," indictment by grand jury and trial by jury in a civilian court. O'Callahan v. Parker, *supra,* 273.

before *Long* and *Greene* and for not anticipating the sudden change of the procedure followed since 1902. "The reliance factor, too, favors prospectivity." *Gosa v. Mayden, supra,* 682.

### (c) The Effect on the Administration of Justice

In *Greene* we balanced the benefits which would flow to the individual from retroactivity against the disruption of the administration of justice. We found that, "As to these persons who have been adversely affected by the denial of treatment as juveniles, the harm has already been done. They have been incarcerated with adults and denied the juvenile probation services at the time when those services would have been most effective. It would serve little useful purpose to now extend this decision to cover these persons." *Greene v. State, supra,* 112-113.

Conceding that his "years in an adult prison cannot be returned to him," appellant argues that expungement can return basic civil rights and opportunities " . . . free of the felony record which now hangs over his head. Expungement would accomplish these goals at virtually no cost or inconvenience to the state."

It is not merely the "cost and inconvenience to the state" which we are told by *Gosa* to consider but rather " . . . the impact of a retroactivity holding on the *interests of society* when the new constitutional standard promulgated does not bring into question the accuracy of prior adjudications of guilt." (Emphasis added.) *Gosa v. Mayden, supra,* 685. It is not as if appellant were now questioning his conviction or seeking reparations for being imprisoned for crimes he did not commit. Appellant committed the crimes for which he was punished, just as those who remained in the military prisons after *O'Callahan,* had committed the crimes for which they continued to be punished. Appellant calls upon us to return to him (and how many others we know not) the right to vote, to serve on juries, to have his testimony accepted without considering the shadow of his past felony record and to conceal from prospective employers the fact that their applicant is a convicted felon.

As compensation for having lost the opportunity to be a candidate for rehabilitation as a juvenile, appellant, in our opinion, asks too much of society to expect to be viewed as one reborn without his juvenile sins, " . . . when there is no significant question concerning the accuracy of the process by which judgment was rendered or, in other words, when essential justice is not involved." *Gosa v. Mayden, supra,* 685. Notwithstanding appellant was denied the opportunity of rehabilitation — and may even now be rehabilitated — future prospective employers (especially those in sensitive businesses or in fiduciary capacities, as well as their patrons), jurors, litigants (whose own liberty and property may depend upon appellant's testimony) and law enforcement officers as well — all of whom are part of society — have some right to know that appellant has been convicted of six burglaries, even though they were committed in his youth. These are but a part of the "impact" on the "interests of society" to be weighed against the individual's understandable desire to erase the record of his youthful mistakes — an opportunity most of us would welcome. Most certainly those juveniles convicted before the juvenile statute was ever enacted would also decry the denial of its benefits. To continue to extend its application because it may indeed be good social policy is to apply the theory of retroactivity.

Beyond that, the record contains precious little evidence of the administrative impact which retroactivity could portend. We are given no idea how many 16 to 18 year olds were tried as adults in Baltimore City since the geographical disparity in the treatment of juvenile offenders first arose in 1941. A mere glance at the Baltimore City judiciary's administrative statistics gives some indication that the number may be immense.

We even glean some significance in the restricted application of *Woodall,* the unsteady foundation upon which appellant's argument is built. *Woodall* expressly stated that 122 persons, all of whom were still in custody or under the supervision of penal authorities, were entitled to the retroactive application of the rationale of *Long.* These

persons were imprisoned, paroled or on probation. The Court noted, "We have not included twenty people whose probation to the Municipal Court of Baltimore City will have expired . . . by the time this decision takes effect. To the extent, however, that any terms of these probations are still in effect, our decision applies to them." *Woodall v. Pettibone, supra,* 53, footnote 9. No explanation was given for so confining the retroactive applicability, although, the restrictive language followed a recognition of the " . . . considerable stress . . ." put by the state's attorney on the enormity of the burden on the State that expunction would require. The Court's reservations, emphasized by the limited application of its decision, and its requirement of a case by case determination, indicate an inherent recognition of the same concerns soon to be expressed in *Gosa.*

We conclude that the purpose to be served by *Long,* the reliance on the law as it stood before that decision, and the effect of a holding of retroactivity, all require that *Long* and *Greene* be applied only after the date set forth of May 15, 1969. The " . . . decisions of the United States District Courts or of United States Courts of Appeals, unlike decisions of the Supreme Court of the United States, are not binding upon this Court, *Moon v. State,* 1 Md. App. 569, . . .; *Lawrence v. Woods,* 432 F. 2d 1072 . . . ." *Greene v. State,* 11 Md. App. 106, 110. We are, however, bound by decisions of the Court of Appeals of Maryland even when they "approve" as "appropriate, proper and valid . . ." a decision of this Court; and, we might add, we are not easily persuaded to depart from our own decisions. Following the guidance of *Gosa,* the approval of *Franklin* and the ruling of *Greene* we affirm the judgments of the court below.

*Judgments affirmed.*
*Costs to be paid by appellant.*